## CHEEVER *v.* WILSON.

1. A married woman having rents from her separate real estate which had been settled upon her and was leased by her on long leases, subject to her mother's dower, pledged them to her tenant by proper instrument, to a certain amount for advances. Some time afterwards, her mother being yet alive, she was divorced by a decree which ordered her to direct payment of a third of the rents *as they should become due*, to her husband for the *education and support* of certain of their common children, which the court in decreeing the divorce assigned to him. The tenant refused to pay the husband anything in any way, but paid his own advances, and then kept rents on hand, paying some to the wife. After the divorce, and so after the husband's rights under the decree had attached, she made a further pledge of the rents to the tenant. It took some years before the sum for which the rents were pledged before the divorce was paid. On bill by the husband and account ordered—the mother being now dead, and the dower third having fallen in to the wife—the auditor held,

    i. That as soon as the advances for which the rents were first pledged were paid, the husband was entitled to be subrogated to the wife's full rights, against the tenant as existing at the time when the order in divorce was made (that is to say, exclusive of the dower third), till his third of the two thirds, with interest from the date of the decree, was paid;

    ii. That the tenant, for the payment of his demand under the pledge made after the divorce, was to stand postponed till this third of the husband's was fully paid, and,

    iii. That the wife (to whom, as already said, after the divorce there had fallen in, by her mother's death, the dower third, a part not subjected by the decree, to her husband), was to be confined to the enjoyment of that dower third till the husband was fully paid his third of the original two thirds, and the tenant was paid whatever he had advanced after the divorce. *Held*, that the report was right.

2. A married woman has the same power as a *feme sole* to pledge rents settled in trust for her to receive, take and enjoy them to her sole and exclusive use and benefit.

8. Where a decree in divorce gives a husband one-third part of his wife's rents, these being at the time of the decree subject to a paramount right of dower in her mother, the third does not become in any way augmented by the mother's death and consequent falling in of her dower's third.

4. Where a divorced husband brings a claim against a tenant of his wife for a portion of her rents allotted to him by the decree of divorce, the tenant, if he means to take advantage of an alleged nullity of the decree, must make his averment of the nullity in such form as that the

husband can take issue.  He cannot set it up on argument, although his averment was that he had a mortgage of the rents, and " reserves to himself the right to impeach the decree if occasion should offer and require him to do so."

5.  A decree in divorce, valid and effectual by the laws of the State in which it was obtained, is valid and effectual in all other States.  Whether the finding by the court of domicil on which the decree is founded is conclusive or only *primâ facie* sufficient is not decided.

6.  A wife may acquire a domicil different from her husband's whenever it is necessary or proper that she should have such a domicil, and on such a domicil, if the case otherwise allow it, may institute proceedings for divorce, though it be neither her husband's domicil nor have been the domicil of the parties at the time of the marriage or of the offence.

APPEAL from the Supreme Court of the District of Columbia; the case being this:

By a statute in force in Indiana in 1857* it was thus enacted:

" Divorces may be decreed by the Circuit Court of the State on petition, filed by any person at the time a *bonâ fide* resident of the county in which the same is filed; of which *bonâ fide* residence the affidavit of such petition shall be *primâ facie* evidence.

" The grounds of divorce are (among others):

" Abandonment for one year.

" Cruel treatment of either party by the other."

The statute further declares that, the court, in decreeing a divorce, shall make provision for the guardianship, custody, support, and education of the minor children of such marriage.

With this statute in force, one Mrs. Annie Jane Cheever, in June, 1857, she being then in Marion County, Indiana, filed a bill in the County Court of the State (the proper court, if the case were otherwise one for its cognizance), praying a divorce, *a vinculo*, from her husband, B. H. Cheever.  Mrs. Cheever had come to Indiana from Washington in apparently the February preceding, and the city just named was the place where her parents had long lived, where it seemed that she was brought up, and where in 1842 she was married; a contemporary document describing both herself and

* Act of May 13th, 1852.

her then intended husband, as " of the city of Washington."
At the time of the application for divorce, Mrs. Cheever was
owner, as for more than seventeen years previously she had
been, by devise from her father, of real estate in Washing-
ton; a store on Pennsylvania Avenue and two houses on
Sixth Street; property which on her marriage in 1842 had
been settled in trust, that she should " receive, take, and
enjoy the rents and profits to her sole and exclusive use and
benefit."

There was little in the record to show exactly what motive
took Mrs. Cheever from Washington to Indiana; or how long
*exactly* she remained in Indiana, or how or where, by dates,
she was living after she left it. But it was certain that di-
vorces *a vinculo* could not, when she went to Indiana, nor
until long after she was divorced in that State, be obtained
by law in the District of Columbia.

Her petition for divorce—which described her as a resi-
dent of Marion County, and, to which was annexed an affi-
davit that she was a *bonâ fide* resident of the county at the
time the petition was filed (June 16th, 1857), and was so
still—represented that she had been married to Cheever;
that after conduct to her, harsh, cruel, and severe, he had in
1854 abandoned her without any purpose of returning to her;
and it gave the names and dates of birth of four children,
which it stated were the issue of the marriage.

The husband, by an answer of three lines, denied the alle-
gations of the wife's bill, and required strict proof; and on
his part filed a cross-bill, setting forth the fact of her sepa-
rate property, the existence of the children, that in 1854 a
disagreement arose between him and his wife which was
wholly irreconcilable, that he had abandoned her with intent
never to live with her again; that reconciliation was im-
possible: and he, too, on his part concluded his petition with
a prayer for *a divorce a vinculo,* and to have custody of the
older children, and the profits of the real estate to support
them.

To this cross-bill of her husband Mrs. Cheever appeared
*without process,* and the cause being called for trial, it *was by*

*consent of parties submitted to the court without a jury,* and " the court having heard the evidence," as the record stated, *found* the marriage, abandonment, and *residence of Mrs. Cheever,* the birth and names of the children all as alleged, and on the 26th of August, 1857, decreed the divorce prayed for by both parties alike.

How long Mrs. Cheever remained in Indiana after this date was not quite apparent. It rather *seemed* as if she had left it in the end of the following September. The record of the already described proceeding in divorce, contained under the date of February 24th, 1858, this entry:

" Now comes S. Yandes, Esq., attorney for B. H. Cheever, and L. Barton, Esq., attorney for Annie Jane Cheever, and on *their* motion *each of said parties has leave to withdraw their respective depositions filed in this court at the last term thereof, in the cause then pending for divorce between said Cheever and Cheever."*

Some time before December of the same year (in June, as was said in one of the briefs, without contradiction by the other), Mrs. Cheever remarried, and went to Kentucky. Her second husband dying, she came back, apparently, to Washington. She was there it seemed in 1862 and 1863.

Prior to the divorce she had made to one Wilson, a grocer, two leases of five years each, of the store in Washington; one of the leases, made in 1855, ran from the 1st of October, in that year, till the 1st of October, 1860; and the other (made July 16th, 1857, forty days before the divorce), for a further term of five years, to commence when the first one should expire.

Besides these two leases made *before* the divorce, she made a third one in 1858, *after* it; this third one running for ten years from the expiration of the first one, that is to say, from the 1st October, 1860, till the same day in 1870; this last lease containing a stipulation, that if the premises should be destroyed by fire during the term, the rent should cease until the premises should be rebuilt by the lessors.

Wilson, the lessee, already named, appeared to have been on friendly terms with Mrs. Cheever and her mother, and

from time to time during her domestic troubles advanced to her money; collected the rents of her Sixth Street houses, paid certain claims against her, charging them against the rents of the property occupied or managed by him. To secure him for these advances made, and certain others to be made, Mrs. Cheever, nine months *before* the divorce, executed a deed of trust, in form, to two gentlemen of Washington, Messrs. Carlisle and Maury; and Wilson went on making advances on the one hand, and charging them against rents on the other, to the extent, as was alleged, of near $5000; the whole of this sort of business being done without much formality. A likelihood of confusion of accounts and of contest about them, if third parties became interested to intervene, was augmented by the fact that after the divorce, and after Cheever's rights, if any, under the Indiana order, had attached, Mrs. Cheever-Worcester received further advances from Wilson, not secured by the deed of trust, and which advances it was agreed by her that Wilson should still charge against rents; and finally, that in 1862, the store-house was destroyed by fire, that the mother of Mrs. Cheever-Worcester received the insurance money, $4000, and that Wilson, under the covenant in the last lease, himself rebuilt it.

The decree of divorce in Indiana, which allotted the children in pursuance of the statute there, gave Cheever the three oldest, and Mrs. Cheever one, the youngest, and at the *same time* ordered that "*as the rents should become due and payable,*" he should receive for the maintenance and education of the children which he took, the one third part of those which would be coming to Mrs. Cheever, in her own right, to obtain which Mrs. Cheever was ordered to give to him a proper authority to demand them of the tenant. Mrs. Cheever was to have the remaining two thirds. The mother was still alive, and her dower third was as yet paramount.

Mrs. Cheever, soon after the divorce, executed a power with an assignment to Cheever to receive the rents, interlining in it before execution, a declaration that the assignment was subject to a previous incumbrance of about $5000

to Wilson. Cheever, disregarding this part of the instrument, demanded his one third of Mrs. Cheever's two thirds, and Wilson setting up his prior right, and refusing to pay, Cheever now filed a bill in the court below, against him, Mrs. Cheever (now called Worcester), and her new husband, Worcester himself, setting out the divorce, order, &c., and praying for a specific performance of the Indiana order as to the portion of the rents allotted to him, and for general relief.

Mr. and Mrs. Worcester set up that the advances had not been yet paid by the rents; but, of course, did not set up that the divorce in Indiana was void.

Wilson set up the same allegation that the rents had not yet repaid him his advances made on the faith of them; and while he made no averment that the divorce was void, he yet stated that he " did not admit its validity or regularity, or that it was operative to affect his rights, but, on the contrary, reserved to himself the right to impeach it if occasion should offer and require him to do so." The matter, independently of the question of validity of the Indiana divorce, which, as Worcester died some time after filing his answer, it was possible might now be made, was obviously very much one of figures; and the court, in June, 1863, referred the matter to an auditor to state an account; the mother of Mrs. Cheever-Worcester having died in the April before, and her one third so falling in to her daughter.

The auditor, assuming the validity of the divorce, and bringing his account down as near to the date as practicable of his report, considered that the order of payment ought to be:

1. Wilson's advances to Mrs. Cheever, as secured by the trust deed of Carlisle and Maury.

2. Cheever's one third of the rents under the Indiana order from the time the advances were so satisfied.

3. So much of Cheever's one third of the rents as had been displaced by the interference of Wilson's prior claim, from the date of the Indiana order to the date of the payment of the advances under the trust deed, to payment

of which one third, the whole two thirds of Mrs. Cheever-Worcester's rents were to be devoted; and, as the reporter understood his view—this part of the case not having been argued here—he held* that Wilson was bound on the principle of subrogation to pay so much of Cheever's third as had been thus displaced; the effect of the auditor's whole view being to throw Wilson on later rents for reimbursement of advances not secured by the trust deed (the only ones as yet unpaid), and leaving to Mrs. Cheever-Worcester, for a considerable time, nothing but the dower one third which had fallen in by her mother's death.

Acting on these views of law, and subrogating Cheever to Wilson's rights against Mrs. Cheever-Worcester, the auditor, after much work of calculation, presented certain figures in result. Both Cheever and Wilson excepted to the report. Cheever excepted—

1. To the position assumed by the auditor, that the wife had power, under the marriage settlement, to anticipate and pledge her rents.

2. To the auditor's not bringing in, after the death of the mother, Mrs. Cheever-Worcester's new one third, to help to pay him a one third of the whole rents.

3. To the finding as to the state of the accounts between Wilson and Mrs. Cheever, as to the advances.

Wilson, on his part, objected to his being too much postponed for his later advances.

The court sustained the defendant's exceptions and dismissed the bill, upon the ground that the Indiana decree was wholly void as to each of the subjects of which it undertook to dispose; the divorce, the children, and the property. Cheever then brought the case here.

In this court, while some reference was made, on the side of Cheever, to the views of the auditor as to the wife's power of anticipation, to his view that the dower one third was not subject to the Indiana order; and to his figures; and by

---

* Printed transcript of record, December Term, 1869, No. 53, pp. 47, 53, 54

Wilson to the principle of subrogation adopted, the argument was on the validity of the Indiana divorce and orders.

*Mr. Boyce, for the appellant,* contended that the Constitution ordaining that "full faith and credit should be given to the judicial proceedings of every other State," the judgment, if conclusive, as undoubtedly it was, in Indiana, was conclusive everywhere else in this country.* Jurisdiction having attached, the judgment was not open to inquiry upon the merits; that judgments of another State were not *primâ facie* but conclusive evidence of what they adjudged; that while parties not privies could show that the judgment had been obtained by fraud, or that the court rendering it had no jurisdiction, parties privy to the judgment could not do it.†

*Mr. W. S. Cox, contra,* commenting on the case as already stated, and upon the demoralizing character of the Indiana statute, contended that the courts of Indiana had no right to decree a divorce of any person but of *bonâ fide* domiciled citizens of that State; that the question of *bonâ fide* domicil was always one of fact; that here it was palpable that no case existed in fact, and that the divorce was a divorce by collusion and consent; the wife having set up a domicil in Indiana, because no divorce *a vinculo* could be got in Washington, her true domicil; that Mrs. Cheever could acquire no domicil except that of her husband, who it was not pretended was ever domiciled in Indiana; that even if there had been jurisdiction in Indiana to affect the person, there was none to affect the real estate in Washington; and, finally, that the decree was without parallel, for that it awarded the husband alimony for his own offence of desertion.

Mr. Justice SWAYNE delivered the opinion of the court.

The material facts of the case, as disclosed in the record, are as follows:

On the 6th of September, 1842, Cheever, and the defendant,

---

* Christmas v. Russell, 5 Wallace, 302.    † Clay v. Clay, 13 Texas, 204.

Annie, then Annie J. Hughes, executed a deed of marriage settlement, whereby the title of the real estate therein described, situate in the city of Washington, was vested in Sarah T. Hughes, the mother of Annie, "in trust, to permit her daughter, the said Annie J. Hughes, to receive, take, and enjoy the rents and profits of the said lands and premises to her sole and exclusive use and benefit," &c. The property embraced in the settlement is designated in the proceedings as "the Avenue property," and " the Sixth Street property." On the 8th of September, 1842, the parties were married. On the 10th of September, 1855, Mrs. Cheever and Mrs. Hughes executed to the defendant, Wilson, a lease of the Avenue property for five years, from the 1st of October, 1855, at an annual rent of $1300, to be paid quarterly. On the 26th of November, 1856, they executed a deed of trust to Carlisle and Maury, to secure certain advances therein mentioned, made, and to be made, by the defendant Wilson, to Mrs. Cheever.

This deed refers to the lease, and authorizes Wilson, after the 1st of October, 1857, to retain and apply the rents to the indebtedness until it should be extinguished. On the 11th of February, 1857, Mrs. Cheever executed to Wilson a paper purporting to assign to him all the rents then due and thereafter accruing until he should have received the sums therein mentioned. A further lease was given by Mrs. Hughes and Mrs. Cheever to Wilson, on the 16th of July, 1857, of the Avenue property, for the term of five years, to commence on the 1st of October, 1860, at the same rent, to be paid in the same manner as was provided in the former lease. Mr. and Mrs. Cheever lived together in Washington until December, 1854, when they separated. On the 16th of June, 1857, Mrs. Cheever filed her petition for a divorce in the Circuit Court of Marion County, Indiana. She described herself therein as a *bonâ fide* resident of that county. The cause was removed by an order for a change of venue to the Circuit Court of Madison County, in that State. On the 19th of August, 1857, Cheever appeared and filed his answer and a cross-petition. On the 26th of that month the court decreed

a divorce *a vinculo matrimonii*, and thereafter, by the agreement of the parties, it was further decreed that Cheever should have the custody of the three elder children, and that Mrs. Cheever should have the custody of the younger one until the further order of the court; and that for the support and education of the children Cheever should receive one third of the rents and profits, to which Mrs. Cheever was entitled, accruing from the property described in the deed of settlement. The decree declared, " that the same is hereby decreed to the said Benjamin, as the same shall hereafter become due and payable, for the uses and purposes of the said infant children during the lifetime of the said Annie." . . . " And the said Annie shall execute to the said Benjamin a good and sufficient power to receive said rents and profits for the uses and purposes herein declared, which shall be sufficient for the purpose." On the 27th of August she executed such an instrument, pursuant to the decree; but before doing so she added this sentence to the draft which had been prepared: " This assignment of rents is subject to an incumbrance upon said rents to my agent, Jesse B. Wilson, of about $5000." Her interest in the rents at the date of the decree was two thirds in possession, and the remaining third expectant upon the death of her mother, who received that portion for her dower. Notice of the decree was given to Wilson within a very short time after it was rendered. He did not recognize the complainant's claim, and has never paid him anything.

Soon after the divorce was granted Mrs. Cheever married Louis Worcester. On the 11th of December, 1858, Worcester and wife gave to Wilson an instrument whereby they assigned to him all her rents until he should have received the sum of $3000. On the 30th of December, 1858, Worcester and wife and Mrs. Hughes gave to Wilson an extension of his lease of the Avenue property for the term of ten years, from the 1st of October, 1860, being an addition of five years to the term of the last preceding lease. At the same time Mr. and Mrs. Worcester executed to him a further assignment of the rents. The Avenue buildings were destroyed by fire

in April, 1862.   Wilson erected the present store on the property at a cost to himself of upwards of $4000.   He has continued to occupy it, and has paid no rent since the fire to any one.

Mrs. Hughes died on the 12th of April, 1863.   Worcester died before that time.   On the 22d of October, 1863, Wilson and Mrs. Worcester came to a settlement of their accounts. He had collected the rents of the Sixth Street property up to that time, but did so no longer.   The accounts embraced the rent received from that property, as well as that from the Avenue property, and extended to the period of the fire. The result was that she was found to be indebted to him in the sum of $3290.

The complainant's bill was filed the 21st of June, 1858, and seeks a specific performance of the Indiana decree, against Wilson, as to the portion of the rents allotted to the complainant for the benefit of the children.   On the 17th of June, 1863, it was ordered by the court that the auditor should report upon the state of the accounts between Mrs. Worcester and Wilson.   There was no finding as to the rights of the parties, and no specific directions were given in the order.

The auditor made a very elaborate report.   Assuming the Indiana decree to be valid, his conclusions were that the balance due to Wilson for his advances on the faith of the pledges of the rents, prior to the divorce or his having notice, and at the time of notice—which the auditor found to be the 11th of September, 1857—was $4627.78, including interest, and that this balance was extinguished on the 1st of January, 1863, leaving an overplus of $23.30; that there was due to the complainant the sum of $622.97, including interest, for rents, from the time of the payment of Wilson's advances to the 1st of January, 1865, the last quarter-day before the adjustment by the auditor, and the further sum of $2437.41 and interest for rents, from the date of the decree to the time the advances were paid; that the amount of the rents, accruing from the time of the payment of the advances, to the 1st of March, 1865, from the Avenue property,

as well as the Sixth Street houses, while the defendant collected the rents of the latter, excluding the third which fell in by the death of Mrs. Hughes, was $1831.84; that the amount due to the complainant was, therefore, $3060.38, and that the sum in the hands of the defendant, Wilson, applicable thereto in payment, $1831.84, was not sufficient to pay complainant's arrears by the sum of $1295.58.

According to the report the claimant is entitled to a decree against Wilson for the sum of $1831.84, with interest from the 1st of March, 1865, and for the further sum of $1295.58 against Mrs. Worcester, with interest from the same time.   The sum proposed to be decreed against Wilson is made up of two elements: (1) the complainant's share of the rents received by Wilson after his advances were paid, with interest down to March 1st, 1865, being $622.97; and (2) the share belonging to Mrs. Worcester of the rents accruing after the same period (excluding her mother's share, which lapsed by her mother's death), with interest computed also to the 1st of March, 1865, being $1208.87, these sums making together the aggregate of $1831.84.   The auditor held that Wilson was liable for the latter sum, because the complainant was entitled to it, on the principle of subrogation.   All the parties excepted to the report.   The court sustained the defendants' exceptions, and dismissed the bill upon the ground that the Indiana decree was void.

Upon the execution of the deed of settlement, the real estate therein described became the separate property of Mrs. Worcester, and she had the same power to anticipate and encumber the rents as if she had been a *feme sole.* *

The proportion of the rents to which the complainant was entitled was one third of the two thirds to which Mrs. Worcester was entitled at the time of the rendition of the de-

---

* Colvin v. Currier, 22 Barbour, 387; Heatley v. Thomas, 15 Vesey, Jr. 596; Bullpin v. Clarke, 17 Id. 365; Jaques v. Methodist Church, 17 Johnson, 548; North American Coal Company v. Dyett, 7 Paige, 9; Insurance Company v. Bay, 4 Comstock, 9; Gardner v. Gardner, 22 Wendell, 526; Browning v. Coppage, 3 Bibb, 37, 1 Story's Eq. § 64.

cree in Indiana. The decree had reference to her rights as they existed at that time. It was not affected by the falling in of the other third, which her mother held as her dower to the time of her death.

The complainant was not bound by the lease of December, 1858. It was executed after the decree and notice to Wilson. He was bound by the preceding lease of July, 1857, which was executed before the decree. That lease contained a covenant on the part of Wilson to repair and pay rent. It did not expire until October 1st, 1865.

The buildings on the Avenue property destroyed by fire in April, 1862, were insured in the name of Mrs. Hughes for $4000, and she received that amount from the insurance company. The lease of 1857 fixed the amount of the rent, and the complainant is entitled to claim accordingly.

Under the lease of 1858, important questions may arise between Wilson, Mrs. Worcester, and the estate of Mrs. Hughes, but they do not affect the rights of the complainant in this litigation, and we need not therefore consider them.

It was proper, under the circumstances, to include in the accounts the rents received by Wilson from the Sixth Street property. That property was embraced in the deed of settlement and in the Indiana decree. The record of that case was filed with the bill as an exhibit, and became a part of it. The prayer of the bill is for general relief. The securities given by Mrs. Worcester embraced alike the rents accruing from that and the Avenue property. Wilson had applied and credited both. It would not be proper to withdraw and separate the former.

It appears by the complainant's exceptions, that he objected strenuously in the court below to the findings of the auditor, as to the state of the accounts between Wilson and Mrs. Worcester touching the advances. After a careful consideration of the evidence, we are satisfied with his conclusions, and see no reason to disturb them. We do not think anything would be gained to the interests of justice by modifying the report, or by setting it aside, and ordering a further examination of the subject.

We think the auditor was right in his conclusion upon the point of subrogation. A much larger amount of the complainant's share of the rents than this principle will give him of hers, was applied in payment of Wilson's advances. It is proper that an equal amount of her share, according to her rights, as they were when the decree was rendered, should replace what had been so applied for her benefit. This will leave, unaffected by this ruling, for her enjoyment, the full third which had belonged to her mother, and to which she became entitled at her mother's death. We are satisfied with the auditor's findings as to the amount for which the defendants respectively should be held liable. Their exceptions should have been overruled.

The decree rendered in Indiana, so far as it related to the real property in question, could have no extra-territorial effect; but, if valid, it bound personally those who were parties in the case, and could have been enforced in the *situs rei*, by the proper proceedings conducted there for that purpose.* But no question arises upon that subject. The assignment executed by Mrs. Worcester to the complainant, of the 27th of August, 1857, in pursuance of the decree, was ample to vest in him the interest and authority which the court ordered her to convey. The reservation in behalf of Wilson was only what the law without it would have prescribed, and did not impair its efficacy, or limit what would otherwise have been the scope of its effect and operation.

The main pressure of the arguments here has been upon the question of the validity of the Indiana decree. Those at the bar were confined to that subject, and the printed briefs go but little beyond it.

The courts of the United States take judicial notice of the laws and judicial decisions of the several States.†

Upon looking into the laws of Indiana we find that the

---

* Sutphen v. Fowler, 9 Paige, 280; Massie v. Watts, 6 Cranch, 148, 158; Swann v. Fonnereau, 3 Vesey, Jr. 44; Portarlington v. Soulby, 3 Mylne & Keene, 104; Monroe v. Douglass, 4 Sanford's Chancery, 185; Shattuck v Cassidy, 3 Edwards' Chancery, 152; 1 Story's Eq., §§ 743, 744.

† Pennington v Gibson, 16 Howard, 80.

Opinion of the court..

proceedings in the case there were governed by "an act regulating the granting of divorces, nullification of marriages, and decrees and orders of court incidental thereto," approved May 13th, 1852. The petition makes a case within the statute. It alleges that the petitioner was a *bonâ fide* resident of the county where it was filed, and sets forth as causes for a divorce abandonment from December, 1854, and cruel treatment, by the husband. His answer denied the allegations of the petition. His cross-petition prayed for a divorce, for the custody of the children, and for provision for their support out of the separate property of the wife described in the deed of settlement. The decree sets forth as follows: "The court find the marriage, abandonment, and residence of the said Annie J. Cheever, and the births, and names, and ages of the children, as alleged in the original petition, to be true, and the residue of said petition to be untrue." A divorce was thereupon adjudged in the usual form.

It would be a sufficient answer to the questions raised as to the validity of this decree, that no such issue is made in the pleadings. The answer of Mrs. Worcester is silent upon the subject. Wilson, in his answer, says he "does not admit the validity or regularity of said decree," or that "it is operative to affect his rights," but, on the contrary, . . "reserves to himself the right to impeach it if occasion should offer and require him to do so." This language is too vague and indefinite to have any effect. If he desired to assail the decree he should have stated clearly the grounds of objection upon which he proposed to rely. The averments should have been such that issue could be taken upon them.* He and his co-defendant are precluded by the settled rules of equity jurisprudence from entering upon such an inquiry. Their silence is an admission, and they are bound by the implication. As, however, the question has been fully argued upon both sides, and may arise hereafter in further litigation between the parties, we deem it proper to express our views upon the subject.

---

* White *v.* Hall, 12 Vesey, 324.

The petition laid the proper foundation for the subsequent proceedings. It warranted the exercise of the authority which was invoked. It contained all the requisite averments. The court was the proper one before which to bring the case. It had jurisdiction of the parties and the subject-matter. The decree was valid and effectual, according to the law and adjudications in Indiana.*

The Constitution and laws of the United States give the decree the same effect elsewhere which it had in Indiana.† "If a judgment is conclusive in a State where it is rendered, it is equally conclusive everywhere" in the courts of the United States.‡

It is said the petitioner went to Indiana to procure the divorce, and that she never resided there. The only question is as to the reality of her new residence and of the change of domicil.§ That she did reside in the county where the petition was filed is expressly found by the decree. Whether this finding is conclusive, or only *primâ facie* sufficient, is a point on which the authorities are not in harmony.|| We do not deem it necessary to express any opinion upon the point. The finding is clearly sufficient until overcome by adverse testimony. None adequate to that result is found in the record. Giving to what there is the fullest effect it only raises a suspicion that the *animus manendi* may have been wanting.

It is insisted that Cheever never resided in Indiana; that the domicil of the husband is the wife's, and that she cannot have a different one from his. The converse of the latter

---

* Statute of 1852, § 33; McQuigg *v.* McQuigg, 13 Indiana, 294; Noel *v.* Ewing, 9 Id. 52; Lewis *v.* Lewis, Ib. 105; Rourke *v.* Rourke, 8 Id. 430; Tolen *v.* Tolen, 2 Blackford, 407; Wilcox *v.* Wilcox, 10 Id. 436.

† Constitution, Art. 4, § 1; 1 Stat. at Large, 122; D'Arcy *v.* Ketchum, 11 Howard, 175.

‡ 2 Story on the Constitution, § 1313; Christmas *v.* Russell, 5 Wallace, 302.

§ Case *v.* Clarke, 5 Mason, 70; Cooper's Lessee *v.* Galbraith, 3 Washington Circuit Court, 550; McDonald *v.* Smalley, 1 Peters, 620.

|| Noyes *v.* Butler, 6 Barbour, S. C. 613; Hall *v.* Williams, 6 Pick. 239; Mills *v.* Duryee, 2 Amer. Leading Cases, 791, note.

proposition is so well settled that it would be idle to discuss it. The rule is that she may acquire a separate domicil whenever it is necessary or proper that she should do so. The right springs from the necessity for its exercise, and endures as long as the necessity continues.* The proceeding for a divorce may be instituted where the wife has her domicil. The place of the marriage, of the offence, and the domicil of the husband are of no consequence.†

The statute of Indiana enacted that "the court, in decreeing a divorce, shall make provision for the guardianship, custody, and support, and education of the minor children of such marriage."‡ That part of the decree which relates to this subject has been already sufficiently considered. *Barber* v. *Barber*,§ has an important bearing upon the case under consideration. There a wife had obtained a divorce *a mensâ et thoro*, and an allowance of alimony, in the State of New York. The husband afterwards removed to Wisconsin To enforce the payment of the alimony she sued him in equity in the District Court of the United States for that district. The court was clothed with equity powers. The ground of Federal jurisdiction relied upon was the domicil of the husband and wife in different States. The court decreed for the complainant. This court, on appeal, recognized the validity of the original decree, sustained the jurisdiction, and affirmed the decree of the court below. This is conclusive upon several of the most important points involved in the case before us.

DECREE REVERSED, and the case remanded with directions to enter a decree

IN CONFORMITY TO THIS OPINION.

---

* 2 Bishop on Marriage and Divorce, 475.
† Ditson *v.* Ditson, 4 Rhode Island, 87.     ‡ Act 1852, § 21.
§ 21 Howard, 582.